1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    MARCELLUS MOTLEY,                        No. CIV S-09-1525-CMK-P

12                    Petitioner,

13          vs.                                MEMORANDUM OPINION AND ORDER

14    MATHEW CATE,

15                    Respondent.

16    _____/

17                    Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18    habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to the written consent of all parties, this

19    case is before the undersigned as the presiding judge for all purposes, including entry of final

20    judgment.  See 28 U.S.C. § 636(c).  Pending before the court are petitioner's amended petition

21    for a writ of habeas corpus (Doc. 7), respondent's answer (Doc. 18), and petitioner's reply (Doc.

22    22).

23    / / /

24    / / /

25    / / /

26    / / /

# I. BACKGROUND

**A.    Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> The incidents in question occurred on June 28, 2006.  In June 2006, Brenisha Torbert was dating Dwayne Zachary.  Torbert and defendant had dated previously for about two months.  Torbert and Zachary's sister, Allean, were close friends.  Shaira Gordon was a close friend of Allean's.
>
> On June 28, 2006, Torbert, Allean Zachary, and Gordon drove in Torbert's blue Neon to the house of Allean Zachary's cousin on High Street in Del Paso Heights.  Dwayne Zachary was at the house on High Street, as were two other unidentified males.  While Torbert, Allean Zachary, and Gordon were at the High Street house some other women who were also at the house left in Torbert's blue Neon, and were gone for about 10 or 15 minutes.  Gordon testified she thought three of the women left in the car, but she also said she did not see Dwayne Zachary or one of the other males at the house during the time the car was gone.
>
> About 10 minutes after the group returned in Torbert's car, Gordon, Torbert, and Allean Zachary left the house and were walking toward Torbert's car when a white van pulled up in front of the driveway, the sliding door on the side of the van opened, and someone inside the van started shooting.  Allean Zachary testified the shooter looked like a "boy" named Cellybo, whose picture she had seen on Torbert's My Space page.  Cellbo or Cellbo are names defendant uses.  Allean Zachary described the shooter as wearing a white T-shirt and jeans.  Before he shot the gun, he said, "[s]tars up."  "Stars up" is a phrase used by members of a criminal street gang known as the Bad Ass Young Start, or BAYS, also known as G Mobb.  Defendant is a validated member of G Mobb.
>
> After the van drove off, the girls ran back into the house.  Gordon was bleeding from her lower arm, where she had been shot.  They went out the back door of the house, through the alley, and into the house on the corner, where the residents called an ambulance.  The police dispatch log indicated the call was received at 5:14 p.m.  Torbert told Gordon that she thought defendant was the shooter.
>
> Another witness, unrelated to anyone at the High Street house, was walking home when she saw a white van pass, saw the sliding door of the van open, and saw a dark-skinned black man with blonde dreadlocks, wearing a white T-shirt and jeans holding a gun.  Defendant had dreadlocks with light colored tips.

---

[1]    Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

Gordon had four shotgun pellets in her right forearm.  The front passenger door of the blue Neon had damage that appeared to be from a shotgun shell.  The wadding from a shotgun shell was found in the right front seat.

Officers who responded to the crime scene had information that a blue Neon had been involved in an exchange of gunfire with a white car in the vicinity of High Street just prior to the shooting on High Street.  At 4:55 p.m. security cameras at the Rainbow Market caught the image of two males who appeared to be associated with each other.  One of them was shooting at a white mini-van.  Witnesses indicated a woman was driving a blue Dodge Neon, and the men got into the Neon after the shooting.

Dwayne Zachary was a validated member of the Beast Mob street gang.  The man shooting at the white mini-van near the Rainbow Market fit Dwayne Zachary's description.

Officers responding to the shooting ran defendant's name in their police database, and discovered a report indicating he had been involved in an incident two weeks prior.  The incident report mentioned a white van and a shotgun.  The report listed an address for defendant at 561 South Avenue, approximately five minutes from the scene of the shooting.  Officers found defendant in the garage of the house on South Avenue, hiding behind a big screen television.

**B.**     **Procedural History**

Petitioner was convicted following a jury trial of assault with a firearm, discharge of a firearm at an occupied dwelling, and grossly negligent discharge of a firearm.  The jury found true the special allegation that, in the commission of the offenses, petitioner personally used a firearm.  Petitioner was sentenced to a determinate term of seven years in state prison.  On direct appeal, petitioner's conviction and sentence were affirmed in a reasoned decision issued by the California Court of Appeal.  The California Supreme Court denied review without comment or citation.  Petitioner did not file any post-conviction actions in state court.  Respondent concedes that the petition is timely and that all of petitioner's claims are exhausted.

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

>     (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as determined
> by the Supreme Court of the United States; or

>     (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law.  Under both

standards, "clearly established law" means those holdings of the United States Supreme Court as

of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006)

(citing Williams, 529 U.S. at 412) .  "What matters are the holdings of the Supreme Court, not

the holdings of lower federal courts."  Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en

banc).  Supreme Court precedent is not clearly established law, and therefore federal habeas

relief is unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742,

753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)).

For federal law to be clearly established, the Supreme Court must provide a "categorical answer"

to the question before the state court.  See id.; see also Carey, 549 U.S. at 76-77 (holding that a

state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not

contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

created by state conduct at trial because the Court had never applied the test to spectators'

conduct).  Circuit court precedent may not be used to fill open questions in the Supreme Court's

holdings.  See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

majority of the Court), the United States Supreme Court explained these different standards.  A

state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

the Supreme Court on the same question of law, or if the state court decides the case differently

than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

court decision is also "contrary to" established law if it applies a rule which contradicts the

governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

that Supreme Court precedent requires a contrary outcome because the state court applied the

wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

determine first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040,

1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

State court decisions are reviewed under the far more deferential "unreasonable

application of" standard where it identifies the correct legal rule from Supreme Court cases, but

unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

that federal habeas relief may be available under this standard where the state court either

unreasonably extends a legal principle to a new context where it should not apply, or

unreasonably refuses to extend that principle to a new context where it should apply.  See

Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

decision is not an "unreasonable application of" controlling law simply because it is an erroneous

or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found

even where the federal habeas court concludes that the state court decision is clearly erroneous.

See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

As with state court decisions which are "contrary to" established federal law, where a state court

decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court

denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).  Such decisions

are considered adjudications on the merits and are, therefore, entitled to deference under the

AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

The federal habeas court assumes that state court applied the correct law and analyzes whether

1  the state court's summary denial was based on an objectively unreasonable application of that

2  law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

3

4  ### III.  DISCUSSION

5  In his petition, petitioner raises the following claims: (1) the trial court violated

6  petitioner's confrontation rights by admitting hearsay; (2) the trial court denied petitioner's right

7  to a fair trial by admitting evidence of gang membership; (3) the prosecutor committed acts of

8  misconduct; and (4) ineffective assistance of trial counsel.

9  **A.     Hearsay**

10  Petitioner claims two instances of violation of his confrontation rights causes by

11  improper admission of hearsay evidence.  First, petitioner argues that the trial court improperly

12  admitted the hearsay statements made by his former girlfriend, Charlene Oakley, to the effect that

13  petitioner had access to a shotgun and white mini-van.  Second, petitioner claims the trial court

14  improperly allowed the hearsay statements of an unidentified 911 caller.

15  The Confrontation Clause protects a defendant from unreliable hearsay evidence

16  being presented against him during trial.  See U.S. Constitution, Amendment VI.  Prior to the

17  Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), the admission of

18  hearsay evidence did not violate the Confrontation Clause where the hearsay fell within a firmly

19  rooted exception to the hearsay rule or otherwise contained "particularized guarantees of

20  trustworthiness." Lilly v. Virginia, 527 U.S. 116, 123-24 (1999); Ohio v. Roberts, 448 U.S. 56,

21  66 (1980).  In Crawford, however, the Supreme Court announced a new rule:  Out-of-court

22  statements by witnesses not appearing at trial that are testimonial are barred under the

23  Confrontation Clause unless the witnesses are unavailable and the defendant had a chance to

24  cross-examine, regardless of whether such statements are deemed reliable by the trial court.  See

25  541 U.S. at 51.  If error occurred, the next question is whether such error was harmless.

26  See Bockting v. Bayer, 399 F.3d 1010, 1022 (9th Cir. 2005) (applying harmless error analysis).

1    While the Supreme Court in <u>Crawford</u> "le[ft] for another day any effort to spell

2 out a comprehensive definition of 'testimonial,'" the Court provided some guidance. 541 U.S. at

3 68.  The Court observed that "[a]n accuser who makes a formal statement to government officers

4 bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."

5 <u>Id.</u> at 51; <u>see</u> <u>also</u> <u>Davis v. Washington</u>, 547 U.S. 813 (2006) (holding that law enforcement

6 interrogations directed at establishing the facts of a past crime or in order to identify the

7 perpetrator are testimonial).

8    1.    <u>Statements by Oakley</u>

9    Regarding this claim, the state court outlined the following background:

10    Defendant argues the trial court erred when it ignored its in limine
      ruling and permitted hearsay statements suggesting he had access to a
11    shotgun and white minivan.  He argues the jury should have been
      instructed to ignore the officers' testimony regarding the gun and van until
12    Oakley testified.  Further, since the prosecutor ultimately decided to not
      call Oakley, defendant argues where was no basis for the admission of the
13    evidence of defendant's access to the gun and van.

14 The court then noted the following in a footnote:

15    Oakley was hospitalized suffering from lymphoma at the time of
      trial.  The trial court set up a conditional examination at the hospital, and
16    the court and parties appeared at the hospital for the examination.  Prior to
      bringing Oakley in for questioning, the prosecutor informed the trial judge
17    that Oakley had left a telephone message stating she had lied in her two
      police reports regarding defendant.  Oakley, who was represented by
18    counsel, thereafter informed the court through her counsel that she would
      invoke her Fifth Amendment right against self-incrimination if called as a
19    witness.  As a result, the prosecutor withdrew the subpoena against
      Oakley, and she never testified.

20

21 The state court continued as follows:

22    Despite defendant's arguments to the contrary, the trial court's in
      limine ruling was limited to testimony regarding domestic violence, and
23    did not encompass evidence regarding defendant's access to a shotgun and
      white van.  Moreover, defendant never objected to the gun and van
24    evidence on hearsay grounds, thus the argument is forfeited.  (citation
      omitted).

25

26 / / /

1    Respondent argues that the state court's application of the contemporaneous

2 objection default bars federal habeas review.  Based on concerns of comity and federalism,

3 federal courts will not review a habeas petitioner's claims if the state court decision denying relief

4 relies on a state law ground that is independent of federal law and adequate to support the

5 judgment.  See Coleman v. Thompson, 501 U.S. 722 (1991); Harris v. Reed, 489 U.S. 255, 260-

6 62 (1989).  However, a discretionary state rule is not adequate to bar federal habeas corpus

7 review.  See Siripongs v. Calderon, 35 F.3d 1308 (9th Cir. 1994).  Generally, the only state law

8 grounds meeting these requirements are state procedural rules.  Even if there is an independent

9 and adequate state ground for the decision, the federal court may still consider the claim if the

10 petitioner can demonstrate:  (1) cause for the default and actual prejudice resulting from the

11 alleged violation of federal law, or (2) a fundamental miscarriage of justice.  See Harris, 489 U.S.

12 at 262 (citing Murray v. Carrier, 477 U.S. 478, 485, 495 (1986)).

13    Under California law, ". . . an appellate court will not consider claims of error that

14 could have been – but were not – raised in the trial court."  People v. Vera, 15 Cal.4th 269, 275-

15 76 (1997).  In Rich v. Calderon, 187 F.3d 1064, 1066 (9th Cir. 1999), and Vansickel v. White,

16 166 F.3d 953 (9th Cir. 1997), the Ninth Circuit held that California's contemporaneous objection

17 rule is an adequate and independent state procedural rule when properly invoked by the state

18 courts.  The Ninth Circuit has also concluded that the contemporaneous objection rule has been

19 consistently applied by the California courts.  See Melendez v. Pliler, 288 F.3d 1120, 1125 (9th

20 Cir. 2002).  Because the contemporaneous objection default is adequate and independent, the

21 state court's imposition of that default bars federal habeas review, and petitioner has not

22 demonstrated cause and prejudice such as would justify an exception to application of the

23 procedural bar in this case.

24 / / /

25 / / /

26 / / /

2.      Statements by 911 Caller

The state court outlined the following background relating to this claim:

> Defendant argues the trial court abused its discretion in denying his motion for a new trial. One of the grounds for defendant's new trial motion was the admission of an unidentified witness's statement in one of the 911 calls. Defendant argued the admission of the statement violated his constitutional right to confrontation pursuant to *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177]. He raises the same argument on appeal.
>
> The prosecutor brought an in limine motion to allow the admission of the 911 tapes as a spontaneous declaration under Evidence Code section 1240. Defendant did not object to the admission of the tapes, either in his written motions and oppositions to evidence, or at the hearing. Defendant's only response to the prosecution's motion to admit the tapes was to say, "[i]f the tapes are played, I would ask they be played in their entirety." Defendant has thus forfeited any argument that the evidence was improperly admitted by his failure to assert a timely objections. (citation omitted).

Notwithstanding the procedural default noted by the state court, the court went on to address the merits of petitioners claim:

> In any event, defendant's belated argument that the statements made on the tape by the unknown witness violated his constitutional right to confrontation is incorrect. . . .
>
> The unknown witness's statement on the 911 tape was not "testimonial." "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (citation to Davis omitted). A testimonial statement is one that is "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." (citation to Davis omitted). By contrast, "the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (citation to Davis omitted).

/ / /

/ / /

/ / /

1  In concluding that the statements in the 911 call were not testimonial, the state court held:

2                In the present case, the 911 call began with the caller, Amber
   Cooke, telling the dispatcher that she had just witnessed a "young guy"
3  shooting at a car.  After asking for a few more details, the dispatcher asked
   if anyone got hit.  The caller stated she was going to check on a lady that
4  was sitting at the bus stop with a baby.  The caller asked the unknown
   woman if she was all right, and the woman said, ". . . this white van down
5  there and I was like oh, my god my baby!"  In response to the dispatcher's
   questions, the woman stated that seven or eight shots were fired, that about
6  five people were in the van, that the driver had dreadlocks, the van was a
   Caravan, and after the shooting, it headed toward Rio Linda.  The caller
7  told the dispatcher that the shooting had happened about five minutes
   previously.
8                Although the caller and the unidentified witness described things
   that happened in the past, the shooting had just happened five minutes
9  earlier, and the woman could not be certain that they were not still in
   danger.  The questions asked were to resolve the emergency and identify
10 the perpetrators, i.e., where the callers were, at what kind of car the
   suspects were shooting, whether anyone got hit, how many shots were
11 fired, whether the shooters were still there, and which direction they went.
   Finally, the conversation was not formal, and was not given in a tranquil
12 environment.  In short, the purpose of the 911 call was to describe current
   circumstances, and not to establish some past fact.  The call was not
13 testimonial, and therefore did not violate the defendant's right to confront
   the witnesses against him.

14

15        At the outset, the court rejects any argument that this claim is procedurally barred

16 by virtue of the state court's reference to petitioner's failure to raise a contemporaneous

17 objection.  When the state court discusses a procedural default but also reaches the merits of a

18 claim, a denial of the claim cannot be said to have relied on the procedural default.  See Thomas

19 v. Hubbard, 273 F.3d 1164, 1176 (9th Cir. 2001) (citing Harris, 489 U.S. at 263); see also

20 Panther v. Hames, 991 F.2d 576, 580 (9th Cir. 1993).  As the Ninth Circuit observed in Panther,

21 ". . . because the Alaska Court of Appeals considered Panther's claim on the merits . . . so can

22 we."  991 F.2d at 580.  In Thomas, the state court discussed the issue of procedural default but

23 then went on to deny the claim because any error was harmless.  See 273 F.3d at 1176.  The

24 Ninth Circuit held:  "In doing so, the [state] court left the resolution of the procedural default

25 issue uncertain rather than making a clear and express statement that its decision was based on a

26 procedural default."  Id.  Therefore, where the state court discusses both procedural default and

1  the merits, and does not expressly hold that the procedural default is the basis of the denial, the

2  procedural default does not operate to bar federal review.   Because the state court in this case

3  also addressed the merits of petitioner's hearsay claim regarding the 911 call, this court is not

4  barred from also considering the merits of the claim.

5          As to the merits, the court agrees with the state court that there was no violation of

6  petitioner's confrontation rights because the statements made by the unidentified 911 witness

7  were not testimonial.  Specifically, the questions asked by the 911 dispatcher and the statements

8  made by the unidentified witness were directed at addressing the emergency situation created by

9  the drive-by shooting the witness saw.  The questions were not directed at ascertaining guilt, but

10  at investigating a recent and possibly ongoing crime.  On this record, the court cannot say that the

11  state court's denial of petitioner's hearsay claim was either contrary to or an unreasonable

12  application of Crawford.

13    **B.    Gang Membership**

14          Petitioner argues that the trial court improperly allowed admission of evidence

15  that he belonged to the G Mobb street gang.  According to petitioner, the probative value of such

16  evidence was outweighed by its prejudicial effect.  A writ of habeas corpus is available under 28

17  U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts.  See

18  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195,

19  1197 (9th Cir. 1983).  It is not available for alleged error in the interpretation or application of

20  state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir.

21  1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be

22  utilized to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

23          However, a "claim of error based upon a right not specifically guaranteed by the

24  Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

25  infects the entire trial that the resulting conviction violates the defendant's right to due process."

26  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

1   Cir. 1980)); <u>see also Lisenba v. California</u>, 314 U.S. 219, 236 (1941).  Because federal habeas

2   relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal

3   habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due

4   process.  <u>See Drayden v. White</u>, 232 F.3d 704, 710 (9th Cir. 2000); <u>Spivey v. Rocha</u>, 194 F.3d

5   971, 977-78 (9th Cir. 1999); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991); <u>see</u>

6   <u>also Hamilton v. Vasquez</u>, 17 F.3d 1149, 1159 (9th Cir. 1994).   To raise such a claim in a

7   federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of

8   justice."  <u>Hill v. United States</u>, 368 U.S. 424, 428 (1962); <u>Crisafi v. Oliver</u>, 396 F.2d 293, 294-95

9   (9th Cir. 1968); <u>Chavez v. Dickson</u>, 280 F.2d 727, 736 (9th Cir. 1960).   In any event, an

10   evidentiary error is considered harmless if it did not have a substantial and injurious effect in

11   determining the jury's verdict.  <u>See Padilla v. Terhune</u>, 309 F.3d 614, 621 (9th Cir. 2002); <u>see</u>

12   <u>also Laboa v. Calderon</u>, 224 F.3d 972, 976 (9th Cir. 2001).

13          The state court set forth the following background regarding this claim:

14              The prosecutor made an in limine motion to present evidence of
        defendant's gang involvement.  The prosecutor argued the evidence was

15      relevant to motive and intent, because there was evidence the shooting was
        a gang retaliation of some sort.  He argued the gang evidence was also

16      relevant to identity and to explain why the shooter said "stars up" right
        before he started shooting.  Defendant's gang affiliation also explained his

17      moniker, Cellybo, which was how the witnesses referred to him.  The
        prosecutor also argued the gang evidence was relevant to explain why

18      some of the witnesses were afraid to testify.
            An Evidence Code section 402 examination was held to determine

19      whether Torbert was afraid to testify because of defendant's gang
        affiliation, and whether defendant was affiliated with a gang.  Torbert

20      testified that defendant told her he was a member of the G Mobb gang, and
        Dwayne Zachary was a member of the Beast Mob gang.  She stated she

21      was afraid to testify both because she could be put in fail if she lied and
        because defendant was a member of a gang.  When asked why defendant's

22      gang membership would make her afraid to testify she said, "people being
        in gangs[,] things can happen."  When asked if she thought it was a

23      possibility someone in defendant's gang would try to harm her, she said
        she did not know.

24          Torbert's mother testified that Torbert had been afraid that
        someone would "jump on her" or fight her.  When Torbert's mother asked

25      her why she was afraid of this, she replied, "people will have people jump
        on you."  The mother said she thought Torbert's fears had "kind of

26      settled."

1              A probation officer and a police officer were examined as well.
They testified to the gang affiliations of defendant and Dwayne Zachary.

2

3   Based on the offer of proof, the trial court ruled that the probative value of the evidence

4   outweighed its prejudicial effect.  The court concluded that the evidence was relevant to show

5   motive and the significance of the "stars up" comment.  The state court then outlined the

6   following evidence that was introduced at trial regarding gang membership:

7              Thereafter, there was testimony from one of the responding officers
that most of the witnesses in this case did not want to be involved, which

8            was a typical reaction in this area because of the prevalent gang activity.
There was also testimony that Torbert told one of the officers the shooting

9            may have had something to do with "gang stuff[.]"

10           Dwayne Zachary's probation officer, Matt Mitchell, testified
Dwayne was a member of the Beast Mob, located in North Highlands and
Del Paso Heights.  He testified to Dwayne Zachary's tattoos, and

11           identified pictures of Dwayne showing gang hand signs.  He testified about
the difference between Blood and Crip gangs.  He stated Bloods could get

12           into disagreements with other Blood gangs over such things as illegal
business or females, and that gangs typically make their money from

13           illegal business.  He testified that a gang member might react differently
than a normal man if he found out his girlfriend was dating someone else.

14           They key difference would be that a gang member would be under a kind
of code of respect, and would have to get his respect back amongst his

15           peers.  A gang member would want to confront the other person, and it
could get violent with the girlfriend as well.

16           Mitchell also testified that gang members ensure other people in
the community do not call the police by intimidating and terrorizing them.

17           He testified that there have been instances of gangs retaliating against
someone for testifying or talking to law enforcement.

18           Officer Eric Fong also testified as a gang expert.  He stated that
gangs are a group of more than two people who usually involve

19           themselves in criminal activity to promote their gang and to promote
themselves financially.  He testified that a person may become a gang

20           member by getting jumped in, i.e., attacked by other gang members, or by
doing some deed for the gang like simple assault, or shooting someone.

21           Fong testified about the origins of G Mobb and BAYS, and about
the territories in which they operate.  He testified about the criteria used to

22           validate a gang member, stated he had validated defendant as a G Mobb
member based on his tattoos, his associations, and his My Space page.  He

23           testified about gang hand signs and identified several pictures of defendant
throwing gang signs.

24           Fong testified that BAYS use the sayings "starts up," or "stick up,
starts" to identify themselves.  Fong was not aware that any other gangs

25           used the phrase "start up."  He testified that gang members could get into
disagreements over money, territory, women, or disrespect.  He also

26           testified that dreadlocks had originally been a characteristic hairstyle worn

1      by G Mobb members, with the tips dyed different colors to signify the type of illegal activity in which they participated.

2      Like Mitchell, Fong testified that gang members use intimidation to ensure people in the community will not call the police or testify against them.  The intimidation can be verbal intimidation all the way up to homicide.

5      The state court then held as follows:

6      . . . Evidence of a defendant's gang affiliation creates a risk the jury will find the defendant has a propensity to commit criminal offenses, but where the evidence is relevant to provide identity or motive and it is not more prejudicial than probative, it is properly admitted.  (citation omitted).  Evidence of the culture of gang intimidation is admissible to explain the basis of a witness's fear, to help the jury assess the witness's credibility, and to explain why a witness might repudiate an earlier truthful statement. (citation omitted).

      In this case the gang evidence helped explain the motive for the attack.  It helped explain that what appeared to be simple jealousy could escalate into violence.  It helped explain the meaning of defendant yelling "stars up" before he started shooting.  It helped explain why many of the witnesses gave testimony at trial that differed from the statements they made at the time of the shooting.

      The trial court did not abuse its discretion in admitting the evidence.  The evidence was relevant to issues or motive, identity, and credibility of witnesses.  The gang testimony was narrowly tailored to the relevant issues, was not particularly shocking or inflammatory, and provided information for the jury to put the events of the shooting in context.

17      Clearly, evidence of gang membership or affiliation has the potential prejudicial effect of creating the risk that the jury will determine that petitioner had the propensity to act in conformity with gang activity.  However, on the facts of this case, the possibility of prejudice was outweighed by the significant probative value of the evidence.  Specifically, as the state court noted, the evidence was relevant to show motive, the significant of defendant's "stars up" statement, the reasons witnesses may have been afraid to testify, and the reasons for inconsistent statements by witnesses whose trial testimony was different than prior statements to the police.  Moreover, the record confirms that the evidence admitted was narrowly tailored to these relevant issues.  The court finds that the state court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

### C.   **Prosecutorial Misconduct**

Petitioner asserts three instances of prosecutorial misconduct.  First, he claims that the prosecutor improperly coerced Torbert's testimony by threatening her with a perjury prosecution.  Second, petitioner argues that the prosecutor committed misconduct by failing to advise his witnesses not to discuss the case in the hallway of the courthouse.  Third, petitioner claims that the prosecutor committed misconduct during closing arguments.

Success on a claim of prosecutorial misconduct requires a showing that the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.  See Greer v. Miller, 483 U.S. 756, 765 (1987).  The conduct must be examined to determine "whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly."  United States v. Simtob, 901 F.2d 799, 806 (9th Cir. 1990).   Even if an error of constitutional magnitude is determined, such error is considered harmless if the court, after reviewing the entire trial record, concludes that the alleged error did not have a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  Error is deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's substantial rights."  Kotteakos v. United States, 328 U.S. 750, 760-761 (1946).  Depending on the case, a prompt and effective admonishment of counsel or curative instruction from the trial judge may effectively "neutralize the damage" from the prosecutor's error.  United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d at  806).

1.   Torbert's Testimony

The state court held:

> Defendant . . . argues the prosecutor coerced Torbert's testimony. To preserve a claim of prosecutorial misconduct, defendant must make a timely objection on the same ground and request that the jury be admonished to disregard the impropriety.  (citation omitted).  Defendant made no such objection here, forfeiting his claim of prosecutorial misconduct on this ground.

1   Respondent argues that the state court's application of the contemporaneous objection default

2   bars federal review.  As discussed above, California's contemporaneous objection default is

3   adequate and independent to bar federal habeas review.  Because the state court here imposed the

4   default and did not discuss the merits of the claim, federal habeas review is barred.  Petitioner

5   has not demonstrated cause and prejudice justifying an exception to the application of this

6   procedural bar.

7                    2.       Admonition of Witnesses

8                  Regarding this claim the state court held:

9                       As to the prosecutor's failure to admonish Topaz not to discuss the
                  case outside the courtroom, defendant raised this in his motion for mistrial,
10                but did not object on the ground of prosecutorial misconduct.  In any
                  event, it is not clear on this record that the prosecutor failed to properly
11                admonish the witnesses.  The prosecutor acknowledged that the trial court
                  had admonished counsel to make sure the witnesses refrained from
12                discussing the case.  The prosecutor did not indicate he had failed to heed
                  the court's admonition.  The prosecutor further argued the conversation
13                Topaz was having was not about the case.
                       As indicated previously, none of the jurors who ultimately served
14                on the jury believed that anything said by Topaz was in relation to the case
                  at hand.  Alternate Juror 1, who heard one of the officers say, "it used to be
15                a boyfriend and we're on that beat[,]" was not the alternate juror who
                  replaced Juror 2, the other juror who thought the officers were talking "a
16                little bit about the case[,]" thus was not ultimately a member of the jury
                  that deliberated and reached a verdict.  Under these circumstances, where
17                the discussion about the case, if it occurred at all, was minimal, and where
                  there is no clear evidence the prosecutor failed to admonish the witnesses,
18                no basis for misconduct is shown.

19  Here, Juror 2 may have believed that the officers were talking about the case.  But, this juror was

20  removed.  Alternate Juror 1, who also heard the officers talking in the hallway, did not deliberate.

21  And, none of the jurors who ultimately did deliberate, believed that anything the officers said

22  related to the case.  Therefore, even if the prosecutor did commit misconduct by failing to

23  admonish his witnesses, there was no possibility of a substantial and injurious effect on the

24  verdict.  Any error was harmless.  The state court's denial of this claim was neither contrary to

25  nor an unreasonable application of federal law.

26  / / /

                                          17

3.    Closing Arguments

The state court held:

> Defendant claims the prosecutor improperly argued to the jury that defendant possessed a shotgun and had access to a white minivan two weeks before the crime. . . . Defendant did not raise any objection . . . at trial, and has forfeited any claims of misconduct on this ground.

Again, respondent notes that the imposition of the contemporaneous objection default bars federal habeas review.  The court agrees and finds that petitioner has not demonstrated cause and prejudice to excuse application of the procedural bar here.

The state court continued its discussion of petitioner's misconduct claims relating to closing arguments as follows:

> Defendant also claims the prosecutor engaged in misconduct by commenting on defendant's failure to produce an alibi witness.  Defense counsel made an objection on the ground the prosecutor was shifting the burden of proof on the defense.  The trial court overruled the objections.  The court opined it was not prosecutorial misconduct to comment on the failure to call logical witnesses.
> Immediately after the objection and ruling, the prosecutor emphasized to the jury, "the burden is on me.  The defense is not required to call anybody.  They can rely on the state of the evidence.  They don't have to call anybody.  But you can go back there in jury deliberations and say, hmm, if we – if the wrong person is sitting across from us, why didn't they call an alibi witness?  Where is that mystery person?  Where is the person that can say he was somewhere else when all this happened?  You can consider that."
> A prosecutor may argue that a defendant has failed to produce alibi witnesses.  (citation omitted).  The prosecutor may comment on the state of the evidence or on the failure of the defense to introduce evidence or call logical witnesses.  (citation omitted).  The prosecutor's comments in this case did not in any way imply that defendant had the burden of proof or seek to lessen the prosecution's burden.  The prosecutor's arguments were permissible comments on the state of the evidence and the failure to call logical witnesses, and did not constitute misconduct.

The court agrees with the state court that no misconduct occurred because the prosecutor was commenting on the state of the evidence, or lack thereof, presented by the defense.  Moreover, the prosecutor himself correctly reminded the jury that the prosecution bore the burden of proof and that the defense was not required to present any evidence.  Given that the defense did in fact

present evidence, the prosecutor was entitled to comment on that evidence.   On this record, the

court cannot say that the prosecutor's conduct rendered the trial unfair.  Thus, the state court's

denial of this claim was neither contrary to nor an unreasonable application of federal law.

The state court addressed petitioner's final claim of misconduct relating to closing

arguments as follows:

> Defendant also claims the prosecutor committed misconduct when
> he told the jury there were witnesses who identified the driver of the van
> near the Rainbow Market as wearing dreadlocks, when only one witness
> had done so.  Likewise, the prosecutor stated witnesses heard the shooter
> say "stars up," when only one witness testified to hearing that phrase.
> Defendant has forfeited this claim on appeal because of this failure to
> object below.  In any event, mistaking the matter and referring to witnesses
> in the plural does not constitute deceptive or reprehensible conduct, thus
> was not misconduct.

Because the state court addressed the merits of this claim, this court may do so as well

notwithstanding the state court's reference to the contemporaneous objection default.  On the

merits, the court finds no misconduct.  It appears from the record that the prosecutor's reference

to multiple witnesses instead of one witness was simply an innocent error.  In any event, the

court does not see how petitioner could have been prejudiced given that the jury would have seen

on review of the evidence during deliberations that only one witness had testified to the matters

commented on by the prosecutor.  Thus, the state court's denial of this claim was neither contrary

to nor an unreasonable application of federal law.

### D.    Ineffective Assistance of Counsel

The Sixth Amendment guarantees the effective assistance of counsel.  The United

States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

all the circumstances, counsel's performance fell below an objective standard of reasonableness.

See id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to

have been the result of reasonable professional judgment.  See id. at 690.  The federal court must

then determine whether, in light of all the circumstances, the identified acts or omissions were

1  outside the wide range of professional competent assistance.  See id.  In making this

2  determination, however, there is a strong presumption "that counsel's conduct was within the

3  wide range of reasonable assistance, and that he exercised acceptable professional judgment in all

4  significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

5  Strickland, 466 U.S. at 689).

6        Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

7  at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

8  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

9  reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

10  see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

11  determine whether counsel's performance was deficient before examining the prejudice suffered

12  by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

13  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

14  followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

15  697).

16        The state court addressed this claim as follows:

17        Defendant argues his trial counsel rendered ineffective assistance
       with respect to the admission of information that he had access to a
18        shotgun and with respect to the admission of statements of the unidentified
       witness on the 911 tape.

19                          * * *

20
          First, with respect to the shotgun information, defendant argues
21        that his counsel was deficient in failing to object to the statements of
       Officers Nollette and Topaz on hearsay grounds.  Since the record is silent
22        as to the reason defense counsel failed to object to the evidence, we must
       reject defendant's claim of ineffective assistance unless there could be no
23        satisfactory explanation.
          At the time of Nollette's and Topaz's testimony, both parties
24        anticipated that Oakley would testify that two weeks prior to the shooting,
       defendant had threatened her with a gun because she would not give him a
25        ride in her white van.  The trial court ruled that Oakley could be
       impeached with her statement to the police.  Defense counsel's
26        anticipation that the evidence would come in at some point is a satisfactory

1          explanation of his failure to object, thus we must reject this claim of
           ineffective assistance [of counsel]. . . .
2

3    The court next addressed petitioner's claim that counsel was ineffective for failing to move to

4    strike the testimony from Nollette and Topaz:

5                  Defense counsel may well have determined the evidence was not
           critical in light of the other incriminating evidence against defendant.
6          Conversely, he may have decided a motion to strike the evidence after the
           jury had already heard it would serve merely to highlight the evidence, a
7          result he wished to avoid.  In either case, because there could be a
           legitimate tactical reason for his failure to move to strike the evidence, we
8          reject this claim of ineffective assistance.  (citation omitted).

9    As to petitioner's claim of ineffective assistance regarding the 911 tape, the state court held:

10                 Finally, defendant argues his trial counsel was ineffective for
           failing to raise a confrontation clause objection to the admission fo the
11         unknown woman's statements on the 911 tape.  As we discussed in section
           IV, *supra*, the statement was not testimonial, therefore a confrontation
12         clause objection would not have been successful.  Trial counsel is not
           ineffective for failing to make an objection which, in our opinion, would
13         have been without merit and denied.  (citation omitted).

14         As discussed above, there is a strong presumption that counsel's conduct was

15   within the wide range of reasonable assistance and that counsel exercised acceptable professional

16   judgment.  See Hughes, 898 F.2d at 702.  Regarding the testimony from Nollette and Topaz, the

17   parties' anticipation that the testimony would have come in from other sources satisfies the

18   presumption of reasonableness.  Petitioner has not offered anything to rebut this presumption and

19   establish deficient performance on the part of trial counsel as to the testimony from Nollette and

20   Topaz.  Similarly, after the testimony was offered, counsel's decision not to highlight the

21   testimony by moving to strike must be presumed to be a reasonable tactical choice.

22         As to petitioner's claim that counsel was ineffective for failing to object to the 911

23   tape evidence on confrontation grounds, the court agrees with the state court that counsel was

24   reasonable for deciding not to interpose such an objection.  Specifically, there would have been

25   no basis for the objection because, as discussed above, the statements in question were not

26   testimonial such that petitioner's confrontation right was triggered.

1    For these reasons, the court finds that the state court's denial of petitioner's

2 ineffective assistance of counsel claims was neither contrary to nor an unreasonable application

3 of <u>Strickland</u>.

4

5 **IV.  CONCLUSION**

6    Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the

7 court has considered whether to issue a certificate of appealability.  Before petitioner can appeal

8 this decision, a certificate of appealability must issue.  <u>See</u> 28 U.S.C. § 2253(c); Fed. R. App. P.

9 22(b).  Where the petition is denied on the merits, a certificate of appealability may issue under

10 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a

11 constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either issue a certificate of

12 appealability indicating which issues satisfy the required showing or must state the reasons why

13 such a certificate should not issue.  <u>See</u> Fed. R. App. P. 22(b).  Where the petition is dismissed

14 on procedural grounds, a certificate of appealability "should issue if the prisoner can show:

15 (1) 'that jurists of reason would find it debatable whether the district court was correct in its

16 procedural ruling'; and (2) 'that jurists of reason would find it debatable whether the petition

17 states a valid claim of the denial of a constitutional right.'"  <u>Morris v. Woodford</u>, 229 F.3d 775,

18 780 (9th Cir. 2000) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 120 S.Ct. 1595, 1604 (2000)).

19 For the reasons set forth herein, the court finds that issuance of a certificate of appealability is not

20 warranted in this case.

21 / / /

22 / / /

23 / /

24 / / /

25 / / /

26 / / /

1          Accordingly, IT IS HEREBY ORDERED that:

2          1.      Petitioner's amended petition for a writ of habeas corpus (Doc. 7) is

3    denied;

4          2.      The court declines to issue a certificate of appealability; and

5          3.      The Clerk of the Court is directed to enter judgment and close this file.

6

7    DATED: November 22, 2010

8                                                _____
                                                 CRAIG M. KELLISON
9                                                UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26